UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CURTIS GORDON, *et al.*                                              PLAINTIFFS

v.                                               CIVIL ACTION NO. 3:08-CV-00029

LOUISVILLE-JEFFERSON COUNTY
METRO GOVERNMENT, *et al.*                                           DEFENDANTS

### **MEMORANDUM OPINION**

This matter is before the court on defendants' motion for summary judgment (DN 52). For the reasons set forth herein, defendants' motion will be granted with respect to the plaintiffs' federal claims.

### **BACKGROUND**

On December 5, 2006, a judge issued a warrant authorizing a search at the home of plaintiff Curtis Gordon, located at 7210 Beachland Beach Road in Louisville. The warrant was issued as part of an investigation involving Gordon's business, Commonwealth Security, Inc. ("CSI"). CSI had a contract with the Louisville Metro Housing Authority (the "Housing Authority") to provide security at several Authority-owned housing complexes. The Housing Authority believed Gordon was billing it for security services of sworn police officers, who were paid at a higher rate than civilian security guards, when those services were actually being provided by non-sworn security guards. The Housing Authority also claimed to have discovered that Gordon had forged a letter from a police chief falsely attesting that an individual was a sworn officer. The search warrant for Gordon's home was issued on the basis of an affidavit

sworn to by Louisville Metro Police Sergeant Oscar Graas, who stated that, based on an interview with a former CSI employee, he had probable cause to believe that at least some business records relevant to the investigation were present at the house.

> The warrant issued specifically authorized seizure of the following items:
>
> Documents, paperwork, electronic files, software, including manuals, instruction/installation disks, CDs and storage devices and including manuals, instruction/installation disks, CDs and storage devices and including computers, detailing the scheduling, billing, and payment invoices, contractual agreements etc. for business activities between Commonwealth Security and Housing Authority of Louisville, Dosker Manor, B-Line, Carpenter Apartments, City View apartments, Colonial Square apartments or any other contracts to include politician Curtis Shane etc [sic] from Barren/Hart County. Any financial documents detailing the expenses, expenditures and assets of Commonwealth Security, Inc. and the individual finance details of the owner Curtis Gordon detailing the expenses, expenditures and assets. Any records or personnel files of the present or past employees of Commonwealth Security Inc. Any police uniforms or badges stored on the property to be searched as utilized for the purpose of business for Commonwealth Security, Inc.
>
> Search Warrant (DN 60-7).

The warrant authorized officers to search for these items at the house on Beachland Beach, as well as

> in a vehicle or vehicles described as: Chev 2000 Silver 142-MPC, Red Ford F-150 P.U. KY 3126-NY, Black Jeep 006-DGP or 066-DGP, Silver Navigator, KY FOP P B-080, Red Corvette, plate not visible, and White P.U truck with Commonwealth Security type plaque on side parked at the residence.
>
> *Id.*

Finally, the warrant authorized the search for the items on the person or persons of Gordon, as well as Candace Smith, who was living with Gordon at the time.

The search of Gordon's home began on the morning of December 6, 2006. Gordon was not home at the time. As officers waited outside the house, they observed Smith leaving the

home in a black Jeep. Smith's daughter, B.D., and her niece, A.D., were with her.[1] Three officers followed Smith as she drove away from the home, eventually stopping her on Interstate 265, a few miles from the residence. Smith and the officers spoke briefly by the side of the road, and Smith and the children were told to return to the house with the police. Smith and the girls were placed in separate police cars and driven back to the Gordon home.[2] Upon arriving back at the house, Smith unlocked the door for the officers, and officers began to search the premises. Smith, A.D., and B.D. were kept in the kitchen under an officer's supervision. Both Smith and B.D. were, at one point, permitted to use the restroom, but were not allowed to go unescorted. Smith's mother arrived at the home approximately 20 minutes after the search began, and A.D. and B.D. were allowed to leave with her. Smith was not permitted to leave. Officers searched the home for approximately three hours and seized a number of items, including police uniforms, documents, and computers.

On January 31, 2007, Graas testified about the results of the investigation before a Jefferson County, Kentucky grand jury. The grand jury issued an indictment against Gordon on one count of forgery in the second degree and 43 counts of theft by deception over $300. Gordon was tried on these charges in Jefferson Circuit Court but was not convicted.

In December 2007, Gordon and Smith filed separate complaints against eleven Louisville Metro Police Officers in their individual and official capacities and against the Louisville-Jefferson County Metro Government. Gordon claimed officers stole cash and damaged his home

---

[1] A.D. and B.D. were both approximately 12 years old at the time.

[2] It appears from Smith's deposition testimony that the officers did not physically restrain her, A.D., or B.D. at any point. However, Smith states that she obeyed the officer's "verbal tone" to get into his car. Smith. Depo. (DN 55-3) at 17:8–11.

during the search. He raised a constitutional claim pursuant to 42 U.S.C. § 1983, specifically alleging that the officers had used unnecessary and excessive force in the service and execution of the warrant, that the officers deprived Gordon of his property without adequate justification or probable cause, that the officers unnecessarily caused damage to the house and its contents during the search, and that the scope of the search exceeded that of the warrant. Gordon also raised a state-law claim for conversion, claiming that officers took property that did not pertain to the investigation for their personal use. Gordon later filed an amended complaint that added a claim for malicious prosecution against Sergeant Graas.

Smith's complaint was brought on behalf of herself, A.D., and B.D., and was joined by her sister, Shannon Dailey, who is A.D.'s mother. Smith also raised a § 1983 claim, alleging that she and the children were unlawfully imprisoned, that the officers deprived Smith of her personal property without adequate justification or probable cause, that the officers unnecessarily caused damage to the house and its contents, and that the scope of the search exceeded that of the warrant. Smith also raised a claim for conversion, as well as three statutory state-law claims.[3] Finally, Smith raised a state-law claim for intentional infliction of emotional distress.

The defendants have now moved for summary judgment on all claims.

## ANALYSIS

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

---

[3]Smith claimed the defendants violated Kentucky laws against unlawful imprisonment (KY. REV. STAT. § 509.030), theft by unlawful taking (KY. REV. STAT. § 514.030), and criminal mischief (KY. REV. STAT. § 512.020). She brought her claims pursuant to KY. REV. STAT. § 446.070, which allows a person injured by the violation of a statute to recover damages he sustained as the result of the violation.

CIV. P. 56(a). A genuine issue of material fact arises when there is "sufficient evidence on which the jury could reasonably find for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1985). The disputed issue need not be resolved conclusively in favor of the non-moving party, but that party must present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). The evidence must be construed in the light most favorable to the non-moving party. *Blakeman v. Mead Containers*, 779 F.2d 1146, 1150 (6th Cir. 1985).

**I. Gordon and Smith's Individual-Capacity Claims For Property Damage and Theft**

Gordon and Smith claim that the officers who searched the home did so in an unreasonable manner that violated the Fourth Amendment to the United States Constitution.[4] Specifically, Gordon claims that the officers who searched the home stole $4500 in cash from a bedroom safe. Smith claims that officers stole several photographs of her from the same safe. The cash and photographs are not listed on the inventory of items that were seized from the house, and the officers who participated in the search have all submitted affidavits denying that they took the cash or saw anyone take the cash.[5] Gordon and Smith also claim that the officers who searched the home caused unreasonable damage in the process, including removing the door from a soda machine, opening Christmas gifts, "joyriding" in Gordon's Corvette, cutting the

---

[4]The text of the Fourth Amendment provides, in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.

[5]The officers' affidavits do not mention the photographs.

back of a sofa, and pulling up carpet on the stairs. All officers who were at the scene have also submitted affidavits denying that they drove the Corvette or caused any damage to the house.

"[O]nly officers with direct responsibility for [a] challenged action may be subject to § 1983 liability." *Wilson v. Morgan*, 477 F.3d 326, 337 (6th Cir. 2007). Plaintiffs must provide something more than conclusory allegations of officers' collective responsibility for their claims to survive a summary judgment motion. *See Hessel v. O'Hearn*, 977 F.2d 299, 305 (7th Cir. 1992). In *Hessel*, the plaintiffs claimed that one or more of 14 police officers who searched their business stole several items that were not within the scope of the search warrant. The plaintiffs did not and could not identify which officers were allegedly responsible for the theft. The Seventh Circuit Court of Appeals upheld the district court's grant of summary judgment for the defendants:

> We may assume that the stolen items, however many there were, were taken by one of the 14 defendants. That is not good enough to fend off summary judgment. The plaintiffs allege no conspiracy. And there is no doctrine of superiors' liability to which they might appeal . . . such as might allow imputing the liability of the rank and file to the higher ups. And the plaintiffs do not attempt to invoke the principle . . . that persons who commit a negligent act or sell a defective product may be liable to a victim of one of their number even if the victim cannot prove which of the defendants caused his harm. That leaves the pure principle of collective punishment as the sole possible basis of liability in this case. Happily that principle is not – not generally, anyway – a part of our law.

*Hessel*, 977 F.2d at 305 (citations omitted).

As in *Hessel*, Gordon and Smith have not offered any evidence to indicate which individual or individuals were responsible for the alleged theft or property damage. They nonetheless claim that the issue of liability for the theft and damage must be submitted to a trier of fact. However, to survive summary judgment, plaintiffs must provide evidence "beyond [their] pleadings and [their] own conclusory statements, to establish the existence of specific

triable facts." *Maki v. Laako*, 88 F.3d 361, 364 (6th Cir. 1996). The plaintiffs have not done so here, and the defendants' motion will therefore be granted with respect to plaintiffs' individual-capacity § 1983 claims for property damage and theft.

**II. Smith and Dailey's Individual-Capacity Claims for Unlawful Detention**

Smith and Dailey argue that the Fourth Amendment rights of Smith, A.D., and B.D. were violated when officers followed them from the home, stopped their car, drove them back to the home, and required them to stay in the kitchen while the search was underway.

Officers executing a search warrant for a given location may detain individuals found on the premises, even if the individuals are not named in the warrant. *Michigan v. Summers*, 452 U.S. 692, 705 (1981); *see also United States v. Bohannon*, 225 F.3d 615, 616 (6th Cir. 2000). Officers may also detain individuals who are seen departing the premises and require them to re-enter and remain at the home for the duration of the search. *See Summers*, 452 U.S. at 693. The Sixth Circuit has held that such a stop must take place "as soon as practicable" after the individual departs the residence. *United States v. Cochran*, 939 F.2d 337, 339 (6th Cir. 1991). However, the Sixth Circuit has also made clear that this rule "does not impose upon police a duty based on geographic proximity (i.e., defendant must be detained while still on his premises); rather, the focus is on police performance . . . ." *Id.* Application of this rule "will normally, but not necessarily, result in detention of an individual in close proximity of his residence." *Id.*

It is not clear whether the officers stopped Smith "as soon as practicable" after she left the home. Both Smith and the officers who stopped her say she was stopped within 10 minutes of her leaving the Gordon house. The officers do not provide any estimate of the distance Smith traveled before being stopped, and Smith variously describes it in her response to the defendants'

motion for summary judgment as "five to eight miles," Pl.'s Resp. to Def.'s Mot. for Summ. J. (DN 66) at 16, "6-8 miles," *id.* at 17, and "seven or eight miles," *id.* at 21. The officers have not explained why they decided to follow Smith as long as they did, and neither Smith nor the officers have provided information on conditions that might have affected the decision to stop Smith after 10 minutes instead of immediately after she left the house. This is not sufficient evidence to enable this court to determine whether it was "practicable" to stop Smith before the actual stop occurrred.

Despite this fact, Smith and Dailey's claims, to the extent that they relate to the traffic stop, must be dismissed because the officers are entitled to qualified immunity. Qualified immunity shields governmental officials performing discretionary functions from civil suits "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[6] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Here, the officers did not violate a clearly established right in stopping Smith within 10 minutes of the house. As noted above, the Sixth Circuit has made clear that such stops are acceptable when they occur a "short distance" and "as soon as practicable" after the individual leaves the home. *Cochran*, 939 F.2d at 339. However, the *Cochran* case did not established a fixed radius within which a stop incident to a search warrant must take place. A reasonable officer could have concluded that stopping an individual within a 10-minute drive from her home would constitute a stop made "a short distance" away from the house. Thus, the officers are

---

[6]Smith states that she does not concede that the execution of a search warrant is a discretionary function that gives rise to the defense of qualified immunity. However, the Sixth Circuit has held that officers engaged in the execution of a search warrant may be protected by qualified immunity, *see, e.g.*, *Pray v. City of Sandusky*, 49 F.3d 1154, 1159 (6th Cir. 1995), which leads to the conclusion that the execution of a search warrant can be properly classified as a discretionary function.

entitled to qualified immunity on Smith and Dailey's claims related to the stop of the vehicle and the return of Smith, A.D., and B.D. to the house.[7]

Moreover, officers are also entitled to qualified immunity on Smith and Dailey's claims to the extent that they relate to her detention once Smith and the children arrived back at the house. The Sixth Circuit has held that "there is no clearly established right to be free from detention during a search, authorized by warrant, for evidence . . . ." *Garavaglia v. Budde*, 43 F.3d 1472 (table opinion) (6th Cir. 1994), 1994 WL 70679 at *3. Because officers did not violate a clearly established right in requiring Smith, A.D., and B.D. to remain in the kitchen while the search was underway, Smith and Dailey's claims against them must be dismissed as well.

**III. Gordon's Claim for Malicious Prosecution[8]**

Gordon claims that Graas is liable for malicious prosecution because Graas allegedly told the grand jury that Gordon had a written contract with the Housing Authority that set forth the terms and rates for the security services provided by sworn police officers, when in fact no such contract existed. It appears from the record that Gordon and the Housing Authority had a contract that set forth the terms for services provided by non-sworn security guards, but this agreement did not address the services provided by sworn officers. Gordon stated in deposition testimony that he had reached a verbal agreement with a Housing Authority representative

---

[7]Smith argues that officers did, in fact, violate a clearly established constitutional right in detaining her several miles from the house. In support of this point, she cites a Kentucky case, *Parks v. Commonwealth*, 192 S.W.3d 318 (Ky. 2006). Although *Parks* held that the detention and search of individuals five miles from a home that was the target of a search warrant violated the Fourth Amendment, it did not clearly establish a that a stop of an individual more than five miles from his or her home was automatically a Fourth Amendment violation.

[8]It is unclear from Gordon's complaint whether he is making his claim of malicious prosecution pursuant to federal law, state law, or both. The court will address only his putative federal-law claim here.

whereby Gordon would provide sworn officer services at a rate of $19 per hour, and Gordon drew up and signed a contract saying as much; however, the Housing Authority apparently never returned an executed copy of the contract to him. Graas made several statements to the grand jury relating to the existence of a contract between Gordon and the Housing Authority, and at one point did definitively state that Gordon and the Housing Authority had a contract that provided for sworn police officers to be billed at $19 per hour.[9] It is not clear here whether Gordon and the Housing Authority could be said to have actually had a legally binding contract, but we need not determine this question to resolve the issue before us.

A malicious prosecution claim will not lie if a court finds "that there was probable cause to prosecute [the plaintiff], regardless of any alleged false statements made by [the investigator at the probable cause hearing." *McKinley v. City of Mansfield*, 404 F.3d 418, 445 (6th Cir. 2005). Probable cause exists "where the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949) (quotation omitted).

Probable cause was present here. The majority of Graas' testimony focused not on any putative contract between Gordon and the Housing Authority, but on the fruits of the investigation into CSI's business practices. Graas presented the following information:

---

[9]Graas testified that "The allegations were that Mr. Gordon and his company paid the security officers one rate of pay, paid the law enforcement officers another rate of pay which was higher. And that is indeed part of the contract. The contract for the police officers was $19 an hour is what the security company made. What Curtis paid his officers was less than $19 an hour, but the contract between Curtis and his company and housing was for police officer coverage at the rage of $19 an hour." Grand Jury Transcript (DN 52-15) at 4.

1. Testimony that three individuals approached the Housing Authority to report that they were working in the "police officer position" and that their services were being billed to the Housing Authority at $19 per hour, but that they were not sworn officers.

2. An account of an interview with Donnie Wilson, a former CSI supervisor, who stated that he was not a sworn police officer, but that Gordon had provided him with a badge and shirt to wear that made it appear as though he were sworn. Graas testified that Wilson had told investigators that Gordon had promised to "take care of all the paperwork" related to Wilson's status as a sworn officer. Graas testified that Wilson also told investigators about two other employees who were billed at the sworn officer rate, but were not being paid at that rate and were not sworn officers.

3. An account of an interview with Debbie Bowan, who told investigators that she was a reserve auxiliary police officer whose reserve powers were no longer effective. She told investigators that Gordon had hired her for the sworn officer position at the Dosker Manor housing complex even though she did not have police powers.

4. Testimony about invoices allegedly submitted by CSI to the Housing Authority. Graas stated that the invoices listed the sworn officer position at the Dosker Manor complex as a "police" position, and billed it to the Housing Authority at the rate of $19 per hour. Graas testified that he discovered that three individuals who were not sworn officers were actually working some of those shifts.

5. Testimony about information found in CSI's personnel files, wherein Bown had stated that she was a reserve officer whose powers were effective only in Indiana, and wherein Wilson stated that he had been on felony charges, which Graas said would have likely kept him from obtaining a position as a police officer.

6. An account of an interview with a police chief whose signature Gordon had allegedly forged on a letter stating that Wilson was a sworn police officer.

This evidence provided probable cause on which to indict Gordon on charges of theft by deception and forgery because it would have allowed a reasonable person to conclude that Gordon was knowingly charging the Housing Authority for services (work by sworn police

officers) that he was not providing.[10] Such cause would exist even if Gordon not had a binding contract with the Housing Authority. Graas is entitled to judgment as a matter of law, and Gordon's malicious prosecution claim, to the extent that it is grounded in federal law, will be dismissed.

**IV. Plaintiffs' Claims Against Louisville-Jefferson County Metro Government**

A municipality is not liable under § 1983 for the action of one of its employees unless it can be established that the employee's action was the result of an official municipal policy. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694–95 (1978). The plaintiffs have not shown that any alleged violation of their constitutional rights was the result of an

---

[10]The statute governing theft by deception in Kentucky provides in relevant part as follows:

(1) A person is guilty of theft by deception when the person obtains property or services of another by deception with intent to deprive the person thereof. A person deceives then the person intentionally:

(a) Creates or reinforces a false impression, including false impressions as to law, value, intention, or other state of mind . . . .

KY. REV. STAT. § 514.040.

The statute governing fraud in Kentucky provides as follows:

(1) A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument which is or purports to be or which is calculated to become or to represent when completed:

. . .

(c) A written instrument officially issued or created by a public officer, public employee or governmental agency.

KY. REV. STAT. § 516.030.

Neither of these statutes requires the existence of a contract, and there was probable cause, based on Graas' grand jury testimony that Gordon had "obtain[ed] the property . . . of another" by "[creating] a false impression" about the qualifications of the security officers he was providing.

- 12 -

official Louisville Metro policy or custom. Accordingly, their § 1983 claims against Louisville Metro will be dismissed.

## V. Plaintiffs' Official-Capacity Claims

An action brought against a state official in his or her official capacity "is not a suit against the official, but rather is a suit against the official's office. . . . As such, it is no different from a suit against the State itself." *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989). Because the plaintiffs have not provided a basis for finding Louisville Metro susceptible to liability under § 1983, their claims against the defendants in their official capacities must be dismissed as well.

## VI. Plaintiffs' State-Law Claims

A federal district court has the discretion to decline to exercise its supplemental jurisdiction over state-law claims when all federal claims in a matter have been dismissed. *See* 28 U.S.C. § 1367(c)(3). We will exercise such discretion here, and the plaintiffs' remaining state-law claims will be remanded to Jefferson County, Kentucky, Circuit Court.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment will be granted with respect to plaintiffs' § 1983 claims and denied with respect to plaintiffs' state-law claims, with the remaining state-law claims to be remanded to Jefferson County, Kentucky, Circuit Court.

A separate order will issue in accordance with this opinion.